H. P. DEMERY and EUNICE DEMERY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Demery v. Commissioner
Docket No. 4588-79.
United States Tax Court
T.C. Memo 1981-412; 1981 Tax Ct. Memo LEXIS 328; 42 T.C.M. (CCH) 598; T.C.M. (RIA) 81412; August 10, 1981. *328 Value of 2.86-acre lot lying west of the Intercoastal Waterway near Jacksonville Beach, Fla., contributed to the Methodist Church by petitioners in 1975 determined. Theodore W. Glocker, Jr., for the petitioners. Willie Fortenberry, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' income taxes for their fiscal years ending October 31, 1975, and October 31, 1976, in the amounts of $ 14,486.64 and $ 15,666.60, respectively. Dut to concessions by the parties the only issue for decision is the value of a 2.86-acre parcel of land contributed by petitioners to the Jose Vedra United Methodist Church by deed dated August 28, 1975. A part of the deficiency determined for the fiscal year 1976 results *329 from a disallowance of a carryover of the excess charitable contribution deduction claimed by petitioners on their fiscal 1975 return based on the contribution of the 2.86-acre tract to the church mentioned above. FINDINGS OF FACT The stipulated facts are so found. Petitioners, husband and wife, are individuals who resided in Jacksonville, Fla., at the time their petition was filed. Petitioners filed joint income tax returns for years ended October 31, 1975 and 1976, with the Director, Internal Revenue Service Center, Chamblee, Ga. During those years petitioners operated a business known as "Veterans Army & Navy Surplus Store." Sometime prior to 1975 petitioner, H. P. Demery, purchased several parcels of land in Duval County, Fla., near Jacksonville Beach, lying on the north side of Stacey Road between the Intercoastal Waterway on the east and Eunice Road on the west. One of these parcels consisted of 208.2 acres of undeveloped low-lying marshland on the north side of Stacey Road starting about 1,000 feet east of Eunice Street and extending east toward the Intercoastal Waterway. Demery purchased this property in 1970 for a purchase price of $ 447 per acre. During the *330 early 1970's the real estate in the vicinity of Demery's property was being developed by Jose Vedra Development Corporation, in which Demery had no interest. In 1974, Reverend Gordon N. Craig organized a Methodist Church to be established in the area. He approached Demery about the possibility of a gift of land on which to build a church. Petitioners were pleased with the work of Reverend Craig and on August 28, 1975, they conveyed a 2.86-acre parcel of land to the church as a charitable contribution. This parcel was a part of the marshland and fronted 260 feet on the north side of Stacey Road extending north between parallel lines 480 feet. It consisted entirely of low-lying wetland which would have to be filled before it could be developed, unless structures were built on pilings. The above lot could not be utilized as the church site at that particular time, so in June of 1976 the church exchanged the 2.86-acre lot for a 235-x 480-foot lot located diagonally across Stacey Road to the south which was owned by Port Royal Corporation of Jacksonville, of which Demery was president. This lot was higher land and the church was built thereon. There was no monetary consideration *331 for the exchange but both deeds had attached documentary stamps indicating a consideration of $ 75,000. The lot originally transferred to the church is presently owned by Port Royal Corporation. On their 1975 income tax return petitioners claimed a charitable contribution deduction of $ 75,000 for the gift of the land to the church. The unused portion of the deduction was carried over and deducted on their 1976 and later year returns. On August 22, 1975, 6 days prior to the transfer from petitioners to the church, petitioners sold 83.3 acres of undeveloped land to W.K. Ward Enterprises, Inc., for a total purchase price of $ 1,164,000, or almost $ 14,000 per acre. This land was higher dry land lying between the marshland and Eunice Road, fronting on Eunice Road on the east between Stacey Road to the south and Beach Boulevard to the north. This property was pretty well developed at the time of the trial of this case while the 208-acre tract of marshland was undeveloped. Stacey Road was a paved street extending eastward toward the Inland Waterway from Eunice Road with full utilities available. Starting about opposite the lot originally transferred to the church and extending *332 to the east along the south side of Stacey Road is a rather large subdivision of private residences extending to the Inland Waterway, called Pablo Island. This subdivision was developed some time ago by dredging canals out of the marshland and filling the homesites. As a result most of the homes in the subdivision either front or back onto navigable waters, which lead to the Intercoastal Waterway. It is a popular place to live for boat owners who wish to cruise up and down the Intercoastal Waterway. Petitioners estimated the value of the lot contributed to the church to be $ 75,000 at the time of the transfer in August 1975. This estimate was based on a letter dated September 25, 1975, from Reverend Craig to petitioners. The letter indicated that the church had valued the property at $ 75,000 in applying for a construction loan and that the $ 75,000 figure was based on the potential of 10 building lots with a value of $ 7,500 each, availability of all utilities, location, and recent sales of similar property. The $ 7,500-per-lot figure was in turn based on a prospectus Reverend Craig obtained in February 1973 from the Jose Vedra Development Corporation. The site of the lot *333 in question was zoned RS-7, a residential classification. The Federal Water Pollution Control Act Amendment of 1972 was enacted to control the development of waterways in the nation's wetlands. A permit from the Army Corps of Engineers was usually required in order to develop or alter waterways and wetlands. In the notice of deficiency respondent valued the lot contributed to the church at approximately $ 447 per acre for a total of $ 1,279, the per-acre purchase price petitioner originally paid for the 208.2-acre tract in 1970. On brief, respondent claims the value of the 2.86-acre lot was $ 2,600 at the time of the transfer. ULTIMATE FINDING OF FACT The value of the 2.86-acre lot contributed by petitioners to the Methodist Church on August 28, 1975, was $ 7,000, or approximately $ 2,500 per acre. OPINION The courts should seldom be called upon to place a value on real estate such as this; the parties who have a knowledge of the property and the potential market therefor and their appraisers are in a much better position to arbitrate such an issue than is a judge who often has never seen the property. Perhaps the reason the task has been placed in the lap of the Court *334 in this case is because the parties were so far apart in their values, $ 75,000 by petitioners and only $ 1,279 by respondent. Or perhaps it was because the parties did not get their appraisers together prior to trial. Petitioners did not use a gualified expert as a witness; instead they used a real estate dealer and developer who lived in the area, but he did not have a written report. Respondent offered the testimony of a qualified expert whose opinion was contained in a written report, but neither petitioners nor the Court was given an opportunity to see the report before the trial. This is not consistent with either the terms or the purpose of Rule 71(d)(2) of the Tax Court Rules of Practice and Procedure, and places both the adversary and the Court at a disadvantage in trying to follow the testimony of the expert. Nevertheless, the issue is in the lap of the Court and we have done the best we can on the record before us to arrive at a reasonable result. Unfortunately, the eventual use of this land is so speculative that we could be far off in our estimate or determination but the onus must fall on petitioners, who had the burden of proving error in respondent's determination, *335 for not filling us in with more details if any were available. Petitioners' claim of $ 75,000 in value, or about $ 26,000 per acre, seems way out of the ball park. This estimate is based primarily on the estimate made by Reverend Criag in his letter of thanks to the petitioners that the property could be subdivided into 10 lots valued at $ 7,500 each. That estimate was in turn based on a brochure issued by a development company in early 1973, which was developing property lying on the east of Eunice Road and was probably on high, dry land. At best, this could only be an estimate of the value of lots after someone had incurred the expense of dredging, filling in, and developing the 208-acre tract of marshland. Furthermore, the development company terminated its development in this area sometime prior to 1975 because of the gasoline shortage. Petitioners also relied on the testimony of Demery, who was not a real estate developer, and Arthur Hempen, a real estate salesman who lived and conducted his business in the area, both of whom testified that dredged and filled marshland sold for higher prices than higher dry land. We do not doubt that if the 208 acres of marshland owned *336 by Demery were dredged and filled as were the properties in Pablo Island, with access to canals and the Intercoastal Walterway, it would be quite valuable, but we have no evidence that there were any plans to so develop it, what it would cost to do so, and whether it could be done in light of the Federal government's restrictions on developing wetlands. We do not know who developed Pablo Island, when it was developed, what it cost, or what the residential lots were selling for in 1975. We are quite convinced that the 208 acres of marshland could not have been used for any kind of a development project in the condition it was in in 1975 and would have had little more value, other than speculative value, than it had when Demery bought it in 1970. There had been no improvements on it up to the time of trial and no plans existed for its development at that time. Hempen testified that the highest and best use of the 2.86-acre lot fronting on Stacey Road was for a commercial development that would serve the residents of Pablo Island and the residential area to the weat of the lot. This sounds reasonable, but whether it would be feasible to fill this one lot is questionable. We are *337 convinced that to elevate the value of the marshland property to anywhere near the per-acre value placed on this lot by petitioners would require dredging and filling a large part of the 208-acre tract to give access to the waterway, even if a permit could be obtained, and that this would be an expensive enterprise. The cost of obtaining a permit, dredging, filling, and developing would certainly limit the price a purchaser-developer would pay for the property in its present state. We also have trouble following petitioners' reasoning that this undeveloped marshland was worth almost twice as much per acre as was the 83 acres of higher dry land that was apparently ready for use when petitioners sold it to W.K. Ward Enterprises, Inc., 6 days before they transferred subject lot to the church. In light of the uncertainty about its potential use and the rather large expenditures required to make it usuable at all, we do not believe a purchaser would have paid anywhere near as much for an acre of the marshland as the purchaser paid per acre for the 83-acre tract. Respondent offered the testimony of three witnesses, Reverend Craig, Ronald Silver, and Richard F. Farmer, Jr. Reverend *338 Craig simply testified about his discussions with Demery concerning a contribution of property for the church site, and his discussions with employees of the Jose Vedra Development Co. in 1973. His testimony was of little help on the valuation issue. Silver was a supervisory biologist and chief of the field monitoring unit of the Jacksonville District of the U.S. Army Corps of Engineers. He had been employed by the Corps of Engineers for 5 years but had been in the Jacksonville District only 3 months. He testified about the purpose of the Federal Water Pollution Control Act of 1972 to control the development of waterways and wetlands throughout the nation and explained that section 67 of the Clean Water Act of 1977 was utilized to give the Corps of Engineers authority to supervise and issue required permits for dredging and fill activities in wetlands. He was unfamiliar with the land in question in 1975 and did not know whether a permit would have been required to dredge and fill the subject land in 1975 or whether a permit would have been granted had it been required. However, ha did view and walk the 2.86-acre lot several days before the trial and testified that as of that *339 time a permit would have been required to develop the property. He did not know whether a permit would be issued if requested. Farmer is employed by the Valuation Engineering Section of the Internal Revenue Service in Jacksonville. He qualified as an expert real estate appraiser and had been familiar with the Jose Vedra area for a number of years, having grown up in Jacksonville. His opinion on the fair market value of the 2.86-acre lot at the time it was transferred to the church, $ 2,600, was summarized in a written report received as evidence in this case. Farmer inspected the property in November of 1979 and just prior to the trial in January, 1980. The stated purpose for the appraisal was to estimate the fair market value of the lot on the date it was transferred. The report contains several definitions of fair market value, which are fairly standard, including, to paraphrase, the highest price "which a property will bring if exposed for sale in the open market allowing a reasonable time to find a purchaser who buys with knowledge of all the uses to which it is adopted and for which it is capable of being used." The report relies on the definition of "highest and best *340 use" contained in the Appraisal Terminology and Handbook which emphasizes that profitable or feasible, probable and legal use are the primary factors influencing a property's highest and best use. After discussing the legal aspects of developing the property, the cost of dredging and filling the property, and the availability of numerous high and dry acres in the area for residential or commercial development, the report concludes that the highest and best use of the property in question "is for continued esthetic enjoyment, environmental balance and for insuring preservation in conjunction with nearby and adjacent highlands." Farmer used the market approach to determine the value of the property for its highest and best use as determined by him. He had difficulty finding sales of many comparables but did find 11 sales which he considered to be of comparable properties. Many of these were some distance from the property in question and because of the varying features of each of the properties it is difficult to tell jusy how comparable they were. The 11 sales used reflected sales prices ranging from a low of $ 22 per acre to a high of $ 2,494 per acre. After taking all factors *341 affecting value into consideration, Farmer estimated that the market value of the subject property was $ 900 per acre, rounded to $ 2,600 for the 2.86-acre lot. In light of the great variance between the estimates of the value of this property between people who are familiar with the property and real estate developments and sales in the area, it is difficult for us to arrive at a value in which we have much confidence. There are no particular features of the property in question that we can evaluate independently. The value of this 2.86 acres is so dependent on what might be done with the remainder of the 208 acres of marshland that it becomes pure speculation. We think petitioners' estimate of $ 75,000 is based on the assumption that the entire 208-acre tract had already been dredged and filled with filled lots being used for residential purposes and the dredged canals being used for access to the Intercoastal Waterway, as done with the Pablo Island area across the street. That was not the condition of the property in 1975 and it cannot be said for certain that such development will ever be feasible. Since we have no idea of what it would cost to develop the property to that *342 status, we can give little or no weight to petitioners' estimates of value. We do think that it might be feasible to fill this particular 2.86 acres and use it for commercial purposes, fronting as it does on Stacey Road, as suggested by petitioners' witness Hempen. We have given some consideration to this possibility in arriving at our conclusion. Our principal problem with respondent's appraisal is in accepting the opinion of his expert that the highest and best use of this property is "for continued esthetic enjoyment, environmental balance and for insuring preservation in conjunction with nearby and adjacent highlands." We do not think a willing buyer could be found who would buy the property for that purpose, unless it be the Federal or local Governments. We think respondent's appraiser was estimating the value per acre of the entire 208-acre tract of marshland, without giving much thought to what might be done with this particular 2.86-acre lot which fronted on Stacey Road and was at the westerly end of the 208-acre tract, nearest to the previously developed properties. Utilities were available and it might have been filled and made satisfactory for commercial use without *343 having to dredge canals, etc. Consequently, we have given more weight to Farmer's comparable sale No. 1 which sold for $ 2,494 per acre in 1975. Applying our best judgment to the facts before us, and taking all factors that have been brought to our attention into consideration, we have concluded that the fair market value of the 2.86-acre lot contributed to the church by petitioners in 1975 was $ 7,000. Decision will be entered under Rule 155.